2018 Pa Super 195

| | | |
|---|---|---|
| LAURA L. MAAS, ADMINISTRATRIX OF THE ESTATE OF LISA CHRISTINE MAAS, DECEASED | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| UPMC PRESBYTERIAN SHADYSIDE D/B/A WESTERN PSYCHIATRIC INSTITUTE AND CLINIC; WESTERN PSYCHIATRIC INSTITUTE & CLINIC, MICHELLE BARWELL, M.D. AND WESTERN PSYCHIATRIC INSTITUTE & CLINIC ADULT COMMUNITY TREATMENT TEAM | : : : : : : : : : : | No. 185 WDA 2017 |
| Appellants | : | |

Appeal from the Order November 9, 2016
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 09-18900

BEFORE:  BOWES, J., STABILE, J., and FORD ELLIOTT, P.J.E.

OPINION BY BOWES, J.:                                    FILED JUNE 29, 2018

UPMC Presbyterian Shadyside d/b/a Western Psychiatric Institute and Clinic, Western Psychiatric Institute and Clinic ("WPIC"), Michelle Barwell, M.D., and Western Psychiatric Institute and Clinic Adult Community Treatment Team ("CTT") (collectively the "UPMC Defendants"), appeal from the October

11, 2016 order denying their motion for summary judgment.[1] After thorough review, we affirm.

The facts giving rise to this cause of action are as follows. On May 29, 2008, Terrence Andrews attacked and killed Lisa Maas, a neighbor who lived four doors away in his Oakland apartment building. Mr. Andrews had a long history of mental illness. He had been an inpatient at Mayview State Hospital, where he was diagnosed with, inter alia, paranoid personality disorder and antisocial personality disorder. He had attempted suicide on several occasions and suffered opioid and cocaine dependence. In 2006, he was transitioned to the CTT, and placed in a personal care home. It was at that location that defendant Michelle Barwell, M.D., a psychiatrist who worked with the CTT, first saw him.[2]

_____

[1] Orders denying summary judgment are interlocutory and not immediately appealable. However, the UPMC Defendants filed an application for amendment of the interlocutory order to state pursuant to 42 Pa.C.S. § 702, that the determination involved a controlling question of law upon which there was a substantial difference of opinion, and that an immediate appeal would materially advance the litigation. The trial court agreed, and granted that application. The UPMC Defendants filed a timely petition for permission to appeal with this Court, which we granted by order dated January 30, 2017. Thus, we have jurisdiction to entertain this appeal.

[2] In her deposition, Defendant Barwell stated that she did not think Mr. Andrews was an appropriate patient for CTT, as the program targeted patients with schizophrenia and some bipolar disorders. Deposition Michelle Barwell, M.D., 4/16/15, at 35-6).

In late 2007, Defendant Barwell and the CTT facilitated Mr. Andrews's move from assisted living to independent living in a private apartment building, Hampshire Hall.[3] He signed a one-year lease for Apartment 414, with a term commencing January 2008, and moved into the apartment. His rent was directly paid to his landlord from his social security disability income by a payee service. Mr. Andrews remained under the care of Defendant Barwell, the CTT, and other caregivers at WPIC on an outpatient basis.

Mr. Andrews did not function well in the independent environment. Within one week of moving in, he presented to the Diagnostic Evaluation Center, described as the emergency room ("ER") for WPIC, and reported that he had been experiencing homicidal ideations for two weeks towards his neighbor. He complained that the neighbor knocked on his door in the middle of the night to ask him stupid questions. The record of that visit noted that Mr. Andrews's move to independent living was a stressor. They admitted Mr. Andrews to WPIC for a two-week stay, and, even upon discharge on January 31, 2008, he continued to complain about his housing and neighbors.[4] Mr.

_____

[3] Administratrix originally commenced this action against Delta Management, the owner of the apartment building, and Mercy Behavioral Health and Nadeem Ahmed, M.D., as well as the UPMC Defendants, based on their negligence for failing to warn Plaintiff's decedent of the risk presented by Mr. Andrews. Delta Management was dismissed on preliminary objections in the nature of a demurrer; Administratrix voluntarily discontinued its claims against Mercy Behavioral Health and Dr. Ahmed after discovery.

[4] This and succeeding admissions were voluntary commitments pursuant to 50 P.S. § 7201, generally referred to as a voluntary 201 commitment.

Andrews repeatedly voiced his desire to be placed in a personal care home where he would have more support from caregivers on site.

Mr. Andrews presented again to WPIC's ER on March 5, 2008, reporting homicidal feelings toward others. He stated that he kept himself locked up so that he would not kill other people. Although it was determined at that time that he should be placed in a personal care home, he was admitted to WPIC for three weeks, and he subsequently returned to his apartment on April 1, 2008. Four days later, he presented to WPIC following an attempted suicide, with suicidal and homicidal ideations, and he was admitted to UPMC Braddock. After two weeks of in-patient treatment, he was discharged to his home.

In May, Mr. Andrews made a number of visits to the ER and telephone contacts with CTT. On May 9, 2008, Mr. Andrews went to the ER and reported homicidal ideation towards his neighbor and disclosed his plan to stab the neighbor with scissors. A caseworker was dispatched to the ER at WPIC to persuade him to return home, and he was not admitted. One day later, he called CTT and reported that he was still having homicidal ideations. Within twenty-four hours, he presented to the emergency room at Mercy Behavioral Health, and reported an altercation that had left him angry and depressed. There was an argument, which turned physical, and Mr. Andrews reported that a man he described as his next-door neighbor's boyfriend/friend of a woman who lives nearby hit him on his left arm with a baseball bat. He told Mercy Behavioral Health personnel that he wanted to kill himself and kill this person.

It is expressly noted in the psychiatric evaluation from that visit that Mr. Andrews did not identify the person by name or location. He was admitted to that facility for three days, where he was kept on a routine watch as he had contracted for safety.

Mr. Andrews was evaluated by Defendant Barwell on May 15, 2008, and she described his condition as stable. Nonetheless, Mr. Andrews went to the ER at WPIC on May 18, 2008, describing a plan "to kill the next-door neighbor and everyone" and "eat his pills." Plaintiff's Brief in Opposition to Summary Judgment, 10/4/16, Exhibit 30 at 1. Mr. Andrews told them that his neighbor hit him with a baseball bat because he let the neighbor's battered girlfriend stay at his place. Mr. Andrews reported that he was carrying scissors around with him, but a search of his belongings did not reveal scissors. They made the decision not to admit him because, although he had frequently reported suicidal and homicidal ideations, he previously had not followed through with any such threats. Although Mr. Andrews was upset and insisted that he needed to be admitted, he was sent home.

On May 19, 2008, Mr. Andrews went to the CTT offices. Shortly thereafter, WPIC caregivers gave Mr. Andrews a behavior plan that would reward him with a weekly bus pass and a food voucher if he did not present to any emergency room for two weeks. He called CTT the next day and asked to go to a personal care home. On May 22, he called again and told them he needed to be admitted. A case management note dated May 23, 2008,

indicated that William Brown of the CTT made phone calls to determine bed availability at personal care homes, and that he discussed the options with Mr. Andrews. On May 24, Mr. Andrews called the CTT complaining that he lacked food and toilet paper. Mr. Andrews hung up after he was reminded that he had to go two weeks without ER visits in order to get the voucher.

Despite the fact that he would lose the incentives, Mr. Andrews went to the ER at WPIC on May 25, 2008, complaining that he was hearing voices and hallucinating. He was evaluated by a psychiatrist. He reported that he had not been taking his medications for three weeks and that he had both suicidal and homicidal ideations. The voices were bothering him and causing him to rave and scream in his apartment. He asked to be admitted. Again, a case manager intervened, and dissuaded him from being admitted. The plan was to deliver his outpatient medications to him the next morning, and to move him to a personal care home in thirty-six hours. After receiving medication for agitation, Mr. Andrews was sent home in a cab.

Four days later, Pittsburgh Police responded to a call of a possible domestic dispute at Hampshire Hall. The officers observed Mr. Andrews, covered in blood, leaving the fourth floor apartment of eighteen-year-old Lisa Maas, a Pennsylvania Culinary Institute student. Ms. Maas was dead due to multiple stab wounds from scissors. Mr. Andrews told police that he did it, and asked to be taken to jail. He also informed the officers that he told Defendant Barwell to put him in WPIC because he was going to kill someone,

and that the medication was not working. He conveyed to police that he disliked Lisa Maas because "she always looked down at him and treated him like dirt." Plaintiff's Brief in Opposition to Motion for Summary Judgment, 10/11/16, at Exhibit 37 (Affidavit of City of Pittsburgh Police Officer George Satler, 5/30/08).

Laura L. Maas, Administratrix of her daughter Lisa's estate ("Administratrix"), filed a wrongful death and survival action against Delta Management, the owner of the apartment building, Mercy Behavioral Health, Nadeem Ahmed, M.D., and the UPMC Defendants herein, based on their negligent failure to warn her deceased daughter of the risk presented by Mr. Andrews. Delta Management was dismissed on a demurrer; Administratrix voluntarily discontinued her claims against Mercy Behavioral and Dr. Ahmed following discovery. Administratrix's claims against the UPMC Defendants proceeded. She alleged that the UPMC Defendants had a duty to attempt to discover the identity of the neighbor or neighbors who were the subject of Mr. Andrews's threat, and to warn them.

The UPMC Defendants moved for summary judgment, alleging that mental health care professionals only have a duty to warn specifically identified persons, not a nebulous group of individuals. Administratrix countered that the victim's name was not required where the potential victims, Mr. Andrews's neighbors, were readily ascertainable. The trial court denied the UPMC Defendants' motion for summary judgment, concluding that the

UPMC Defendants had a duty to warn on the facts presented. The UPMC Defendants obtained the requisite certification and permission to appeal that interlocutory order, and they present one question for our review:

> Whether the [t]rial [c]ourt's misapplication of *Emerich v. Philadelphia Center for Human Development, Inc.*, 720 A.2d 1032 (Pa. 1998), improperly imposed on mental health care providers a duty to warn about vague, non-specific, and non-imminent expressions of homicidal ideations made by Mr. Andrews?

Appellants' brief at 4.

> Summary judgment is proper
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.

> In reviewing the grant or denial of a motion for summary judgment,
>
> [w]e view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

Abrams v. Pneumo Abex Corp., 981 A.2d 198, 203 (Pa. 2009); see also State Farm Fire & Cas. Co. v. PECO, 54 A.3d 921, 925 (Pa.Super. 2012) (holding we may disturb the trial court's determination only for an error of law or abuse of discretion).

The UPMC Defendants contend that they had no duty to warn on the facts herein. "Whether a duty of care exists is a question of law assigned initially to the trial court and subject to plenary review on appeal." Walters v. UPMC Presbyterian Shadyside, 144 A.3d 104, 113 (Pa.Super. 2016) (citing Sharpe v. St. Luke's Hosp., 821 A.2d 1215, 1219 (Pa. 2003); Winschel v. Jain, 925 A.2d 782, 796 (Pa.Super. 2007)). "Where, however, the plaintiff makes a prima facie showing of a duty, the applicable standard of care, whether it was breached, and whether the breach was a cause in fact of the injury are questions of fact for the jury." Walters, supra at 113 (citing K.H. ex rel. H.S. v. Kumar, 122 A.3d 1080, 1094 (Pa.Super. 2015)).

The UPMC Defendants cite Emerich v. Philadelphia Center for Human Development, Inc., 720 A.2d 1032 (Pa. 1998), for the proposition that Pennsylvania law only imposes a duty on mental health professionals to warn third parties of the danger posed by a mental health patient in limited circumstances, which they contend are not present here. Specifically, the duty arises where

   (1)   a special relationship exists between the mental health
         professional and the patient;

(2)     the patient has communicated to the mental health professional a specific and immediate threat of serious bodily injury;

(3)     the patient's threat is against a specifically identified or readily identifiable third party; and

(4)     the mental health professional determines, or should determine, that the patient presents a serious danger of violence to the third party.

Id. at 1043.

The dispute herein primarily involves the third prong. The UPMC Defendants contend that since no potential victim was identified by name, they had no duty to warn. They charge the trial court with misapplying Emerich, and viewing duty in terms of foreseeable victims rather than identifiable victims. They compare the trial court's approach to a "zone of danger" analysis, and allege that the court imposed a new duty upon mental health professionals to warn an amorphous and indiscriminate group of individuals.

The UPMC Defendants acknowledge that the Emerich Court relied upon Tarasoff v. Regents of Univ. of California, 551 P.2d 334 (Cal. 1976), in imposing a duty to warn on the part of mental health professionals. Although in that case the targeted victim was not identified, i.e., named, they argue that there was no doubt as to whom the patient intended to kill. The UPMC Defendants contend that the instant case is more akin to Thompson v. County of Alameda, 614 P.2d 728 (Cal. 1980), where a violent juvenile offender told someone prior to his release from a county institution that he

would kill a young child in the neighborhood. Within a day, he killed the plaintiff's young son, and the plaintiff alleged that the county was negligent for failing to warn "parents of young children within the immediate vicinity." Id. at 730. The trial court sustained a demurrer, finding no duty to warn, and the Supreme Court of California ultimately agreed. Absent "specifically known and designated individuals[,]" the court found that the potential targets consisted of a "large amorphous public group[,]" and that any warning would have been general and covered a broad swath of the population. Id. at 735. The Thompson Court reasoned that, "warnings to the general public would 'produce a cacophony of warnings that by reason of their sheer volume would add little to the effective protection of the public[,]'" which the Emerich Court cited favorably. Id.

The UPMC Defendants also direct our attention to our Supreme Court's decision in Seebold v. Prison Health Services, Inc., 57 A.3d 1232, 1246 (Pa. 2012), where the Court voiced its reluctance to impose new duties upon medical professionals and expressly cabined its holding in Emerich. Therein, the Court found no duty on the part of prison medical providers to warn, protect, or rescue prison employees at risk from inmates with a possible communicable disease unless the health care provider played a role in creating

the danger.[5]  The UPMC Defendants allege that the trial court's finding that the fourth floor tenants of Hampshire Hall were a readily identifiable group of people to whom the defendants owed a duty to warn violated the public policy expressed in Seebold and imposes liability without any reasonable limit.

Finally, the UPMC Defendants allege that the trial court failed to discuss the second prong of the test, i.e., the specificity and immediacy of Mr. Andrews's threats.  They characterize Mr. Andrews's threats as "vague homicidal ideations lacking any specific and immediate threat of serious bodily injury."  Appellants' brief at 26.

Administratrix counters that the trial court correctly applied the existing duty recognized in Emerich without expanding its reach.  Mr. Andrews articulated a specific and immediate serious threat against a neighbor, an individual who was identifiable as a part of a small group.  Administratrix contends that the potential victim need not be a person identified by name. The "readily identifiable" language would have no meaning, she argues, if it did not contemplate situations such as the one herein where the target of the threat is not named, but discernible.

Administratrix finds further support for her position in the Code of Ethics of Pennsylvania's State Board of Psychology, section 41.61, which was relied

---

[5]  Although the UPMC Defendants cite mental health policy considerations as the basis for the Supreme Court's decision in Seebold, that case did not involve mental health professionals.  See Appellants' brief at 28.

upon by the Emerich Court in defining the duty. That provision states that psychologists should take "reasonable measures to prevent harm when a client has expressed a serious threat or intent to kill or seriously injure an identified or readily identifiable person or group of people and when the psychologist determines that the client is likely to carry out the threat or intent." 49 Pa.Code § 41.61 (emphasis supplied). The trial court herein was persuaded that the duty to warn need not be limited to one person, but could include the members of an identifiable group of persons. The jury could reasonably conclude that the tenants residing on the fourth floor of Hampshire Hall were a readily identifiable group of people to whom a duty to warn was owed. Trial Court Opinion, 5/23/17, at 10.

Administratrix also faults the UPMC Defendants for failing to attempt to elicit identifying information from Mr. Andrews about his intended victim. She directs our attention to Mr. Andrews's psychiatric records where there is no indication that the UPMC Defendants probed for specific information on his target. Although employees of the UPMC Defendants offered deposition testimony to the effect that they attempted to elicit such information, it was not documented in the medical records.

Finally, Administratrix contends the trial court properly considered the specificity and immediacy of the threats. The trial court chronologically detailed Mr. Andrews's growing dissatisfaction with his living situation and his expressed intent to kill his neighbor or neighbors. See Trial Court Opinion,

supra at 9-10. Over the course of several months, his visits to WPIC became more frequent, his threats more specific. By May 2008, he had a plan to stab his neighbor with scissors, and he communicated that specific plan to the UPMC Defendants. Just weeks later, Mr. Andrews reported to them that he was carrying scissors for that purpose. Thus, Mr. Andrews's vague threats evolved into a specific plan to stab his neighbor with scissors, and he armed himself with the stated means to do so. This was the precise method he employed to kill Lisa Maas.

The trial court relied upon Emerich and Althaus ex rel Althaus v. Cohen, 756 A.2d 1166, 1171 (Pa. 2000), in finding a duty on the facts herein. The court rejected the UPMC Defendants' position that the potential victim had to be identified by name. The trial court found that, although what constitutes an identifiable person for purposes of a mental health professional's duty to warn has not been addressed in this Commonwealth, the Code of Ethics for Psychologists contemplates a duty to reveal confidential information to more than a specifically named individual. It found that a reasonable jury could find that "the tenants residing on Andrews'[s] floor in Hampshire Hall were a readily identifiable group of people to whom [the UPMC] [D]efendants owed a duty to warn." Trial Court Opinion, 5/23/17, at 10-11.

The following principles inform our review. In Emerich, the Pennsylvania Supreme Court recognized that, while "there is generally no duty to control the conduct of a third party, where the defendant stands in a special

relationship to the victim or some other party, the victim deserves protection."

Emerich, supra at 1037. That special relationship between the mental health

professional and the patient was the basis for an exception and imposition of

an affirmative duty to warn. The Court went on to explain that the duty arises

when a mental health professional determines that her "patient has

communicated to the professional a specific and immediate threat of serious

bodily injury against a specifically identified or readily identifiable third party

and when the professional determines, or should determine under the

standards of the mental health profession, that his patient presents a serious

danger of violence to the third party."[6] Id. at 1043

In arriving at its holding, our High Court considered the public policy

concerns in protecting persons from serious harm, the confidential nature of

therapist-patient communications, the difficulty in predicting when or if

behavior will become violent, and the policy of treating patients in the least

restrictive environment. It concluded, based upon a balancing of the

aforementioned factors that a duty should be imposed, but that it should not

be extended to the public at large. The Supreme Court held in Emerich that

a mental health professional has "a duty to exercise reasonable care to protect

_____

[6] The Pennsylvania Supreme Court also recognized that the special relationship between a mental health provider and an outpatient, in addition to serving as a foundation for a duty to warn a third party, may "support a broader duty to protect or commit to inpatient treatment." Emerich, 720 A.2d at 1044 n.13.

by warning a third party" of the danger posed by a patient. Id. at 1043. That would include the situation where a patient communicated an "[i]mmediate, known and serious risk of potentially lethal harm" regarding a "specially identified or readily identifiable victim." Id. at 1039-41.

It is undisputed that Mr. Andrews did not verbalize a specific threat against Lisa Maas or any other named individual. However, he communicated to the UPMC Defendants his intent to kill his neighbor and his next-door neighbor. He had a plan. He was going to use scissors to stab his neighbor. Shortly before the tragic events herein, he told the UPMC Defendants that he was carrying scissors on his person for that purpose.

Preliminarily, we note that in Tarasoff, the seminal case, a threat to kill communicated to the therapist two months before the patient acted on it was deemed to be an immediate threat. The patient did not identify his victim, but from the context of the threat, the therapist could ascertain her identity. We find that the duty to warn exists where the target is identifiable, not just identified by name, and that mental health professionals must use reasonable efforts to identify the victim. To give any other interpretation to our Supreme Court's holding in Emerich would negate the meaning of the "readily identifiable" language entirely. Thus, to the extent that the UPMC Defendants contend that the intended target must be named, we reject that position.

Nor is the duty to warn limited to one individual. The duty to warn recognized in Emerich may extend to individuals who are readily identifiable

because they are members of a group. We are persuaded by the analysis of then-Judge, now-Justice Wecht, when he overruled Mercy Behavioral Health's preliminary objection in the nature of a demurrer at an earlier stage of this litigation. He acknowledged that he found "no case law stating that the 'readily identifiable' third party can be a group, but also none to say it cannot be." Memorandum, 7/19/11, at 3. He went on to hypothesize that if a patient threatened to kill people in his workplace, "[t]hat would be a readily identifiable group whose members would be in serious danger[,]" and [a]rguably, a mental health provider would have a duty to warn." Id. In his view, the facts alleged herein did not present a "bigger leap." Id.

Mr. Andrews expressly communicated threats to kill his "neighbor," but did not identify, by name or description, the specific neighbor. He threatened to kill an unidentified individual who was a member of an identifiable group of approximately twenty people. The question is whether the UPMC Defendants had a duty to warn the potential targets, i.e., the fourth floor tenants of Hampshire Hall who were Mr. Andrews's neighbors. Unlike the threat to all of the "young children in the neighborhood" in Thompson, which we agree was a large and amorphous public group, the threat herein was directed at a member of a small, distinct, and identifiable group.

In this case, the UPMC Defendants knew where Mr. Andrews lived. In fact, they assisted him in securing his Hampshire Hall apartment. Practically speaking, the identities of Mr. Andrews's fourth floor neighbors could be

readily ascertained from the building management in order to communicate a reasonable warning. Alternatively, the proximity of their apartments to Mr. Andrews's apartment made it possible to warn these individuals even without knowing their names. Moreover, the group was small enough that a reasonable warning would not "produce a cacophony of warnings" by their volume. Thompson, supra at 735. Hence, we find the facts herein to be more akin to Emerich and Tarasoff, where a duty to warn was imposed.

The UPMC Defendants' reliance upon Seebold misses the mark herein. In that case, the Supreme Court addressed, inter alia, whether Prison Health Services ("PHS"), a contractor providing medical care to prison inmates, had a duty at common law to warn specific corrections officers that a particular inmate had a communicable disease. Under the law applicable in communicable disease cases, the physician's duty to advise and warn extended solely to his patient; the physician had no duty to identify, seek out, or advise third-party non-patients. See DiMarco v. Lynch Homes-Chester County, Inc., 583 A.2d 422 (Pa. 1990) (recognizing that physician owed a duty of care to patient's sexual partner to properly advise patient of the risks of contracting hepatitis), overruled in part by Seebold, supra; Troxel v. A.I. Dupont Inst. (Appeal of Browngoehl), 636 A.2d 1179 (Pa.Super. 1994) (finding no liability on the part of physician to third party who contracted cytomeglovirus from his patient where the physician properly advised his patient about its communicability). The Seebold Court noted that a duty to

warn a third party had only been imposed once in a medical context, in Emerich, and specifically, to a mental health professional.  Even then, the duty to warn extended only "to an identified or readily identifiable victim whom the patient had targeted."  Emerich, supra at 1041.  The Court declined to impose "a new, affirmative, common-law duty in tort on the part of physicians to undertake third-party interventions in a prison setting," without "a broader policy assessment." [7]  Seebold, supra at 1250. We find the facts and policy considerations in Seebold to be vastly different from those identified and assessed by our High Court in Emerich.

Finally, we find no merit in the UPMC Defendants' claim that the trial court failed to consider whether Administratrix demonstrated that Mr. Andrews communicated to them a specific and immediate threat of serious bodily injury.  The court summarized Mr. Andrews's threats to kill his neighbor, which escalated in frequency and specificity over time.  The immediacy of the threat can be inferred from the fact that the UPMC Defendants decided to remove Mr. Andrews and place him in a personal care home "within thirty-six hours," at the precise time Mr. Andrews unveiled his specific plan to stab his neighbor with scissors, and revealed that he was carrying around scissors for

_____

[7] PHS identified numerous policy considerations unique to a prison setting such as "the burden of identifying individuals in prisons at elevated risk for transmission; and practical barriers to physician access to, and ability to disseminate, information in the prison setting[,]" as well as the "maintenance of prison order and security."  Seebold v. Prison Health Servs., 57 A.3d 1232, 1247 (Pa. 2012).

that purpose. The record amply demonstrates that Mr. Andrews's threats of serious bodily injury were specific, and immediate, and communicated to the UPMC Defendants.

We agree with the trial court that Administratrix made the requisite prima facie showing of a duty under Emerich. The remaining questions as to whether the UPMC Defendants breached that duty, whether their conduct fell below the standard of care, and if so, whether it was a cause in fact of Lisa Maas's death, are questions of fact for the jury.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/29/2018