J-A29026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RICHARD MCCURDY AND SANDY MCCURDY, HUSBAND AND WIFE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 319 WDA 2021 |
| C&K INDUSTRIAL SERVICES INC., A CORPORATION OR OTHER SIMILAR BUSINESS ENTITY; GREYCOR INDUSTRIAL CONSTRUCTORS, INC., A CORPORATION OR OTHER SIMILAR BUSINESS ENTITY; UNITED STATES STEEL CORPORATION, A CORPORATION OR OTHER SIMILAR BUSINESS ENTITY | : | |

Appeal from the Order Dated February 18, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-14-001586,
GD-14-001586

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

DISSENTING MEMORANDUM BY BOWES, J.:          **FILED: JUNE 28, 2022**

I respectfully dissent.  Viewing the evidence in the light most favorable

to Richard McCurdy ("McCurdy") and Sandy McCurdy (collectively,

"Appellants"), I find Appellants have raised a material issue of fact as to

whether C&K Industrial Services, Inc. ("C&K") was negligent in permitting the

use of ungrounded polyvinyl chloride ("PVC") pipe in the industrial vacuum

---

[*] Retired Senior Judge assigned to the Superior Court.

system that it designed, constructed, and helped to operate and supervise in conjunction with Graycor Industrial Constructors, Inc. ("Graycor").[1] Accordingly, I would reverse the trial court's order awarding summary judgment to C&K and remand for trial.

This case concerns a static shock injury McCurdy sustained on February 7, 2012, while working as a bricklayer assisting in the construction of C Battery at the Clairton Mill Works, which is owned and operated by the United States Steel Corporation ("USS"). Specifically, McCurdy and his fellow bricklayers were engaged in "dry bricklaying" to construct flues, which created a significant amount of dust. *See* C&K's Motion for Summary Judgment, 2/25/19, Exhibit 3 at 19-20 ("McCurdy Deposition").[2] On the day in question, McCurdy was vacuuming dust and debris from the recently constructed battery flues. The industrial vacuum system used by McCurdy and the other workers consisted of large lengths of polyethylene hoses with spiral wire grounding that were powered by vacuum trucks parked on the exterior of C Battery. While Graycor employees like McCurdy were manning the vacuum hoses, C&K employees were actively monitoring the work and operating safety valves that could be used to shut down the system in case of accidents.

_____

[1] For ease of discussion, I will utilize the spelling "Graycor" in conformity with the Majority's writing. *See* Majority Memorandum at 2 n.2.

[2] The exhibits attached to C&K's motion for summary judgment are not individually numbered or designated. For ease of discussion and reference, I have assigned numbers to these documents based upon order of attachment.

Seventeen-foot-long PVC pipe extensions were attached to the end of these polyethylene hoses, which enabled workers to vacuum the bottom of the flues. C&K's project manager at C Battery, George Baughman, testified that this PVC piping had been provided by C&K. **See** C&K's Motion for Summary Judgment, 2/25/19, Exhibit 6 at 11-12 (testifying that C&K had provided all of the "equipment" utilized at C Battery, which included "PVC pipe").[3] The PVC pipe attached to McCurdy's hose was installed by a Graycor employee, while C&K employees were also present and observing. **See** Appellants' Brief in Opposition to Summary Judgment, 3/29/19, Exhibit A at 7, 11, 16-17 ("Waltermire Deposition").

The certified record establishes that the use of such PVC piping in C&K's vacuum systems was a "rare" occurrence and not typical. **See** C&K's Motion for Summary Judgment, 2/25/19, Exhibit 5 at 15. The reason this material was not regularly utilized by C&K seems self-evident, as an internal report generated by USS concluded that the static shock that injured McCurdy was "created by the velocity of the silica dust passing across the inside walls of **the PVC pipe**." **See** Incident Without Injury Report Form (USS 406), 2/7/12, at 1 (emphasis added). Finally, while the polyethylene hoses contained

---

[3] Later in the same deposition, Baughman stated that he could not remember whether C&K had provided the at-issue PVC pipe, which conflicts with his earlier testimony. **See** C&K's Motion for Summary Judgment, 2/25/19, Exhibit 6 at 31. As discussed further *infra*, we must resolve any such uncertainties or conflict in the record in favor of Appellants.

grounding wires, the PVC extensions were **not** independently grounded at the time of McCurdy's injury. **See** Waltermire Deposition at 10 ("[A]fter [McCurdy] got his electrocution, they brought in the electrician down there and put a ground wire on this PVC pipe."); **id.** at 25 ("They had the electricians come in and actually wire a ground wire to the PVC pipe so that it would ground out instead of shocking the employees down there.").[4]

With these facts in mind, I emphasize that summary judgment is only appropriate in "cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010); **see also** Pa.R.C.P. 1035.2. Thus, our standard of review in the context of summary judgment is well-established:

> When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

**Id**. (cleaned up). Accordingly, "[t]he burden of the non-moving party where summary judgment is requested is not the same as the burden during a trial of the issues, it need only be shown that there is a genuine issue as to **any**

---

[4] Ultimately, all of these PVC extensions were replaced with aluminum pipe, which is a conductive material. **See** Waltermire Deposition at 12-13, 31; C&K's Motion for Summary Judgment, 2/25/19, at Exhibit 10 at 1-2.

material fact." ***Prince v. Pavoni***, 302 A.2d 452, 454 (Pa.Super. 1973) (emphasis added). To the extent there is conflict in the certified record, we must resolve such dissonance in full favor of Appellants' position. ***See Carollo v. Forty-Eight Insulation, Inc.***, 381 A.2d 990, 994-95 (Pa.Super. 1977).

Appellants allege that C&K was negligent with respect to the work performed at the vacuuming operation at C Battery. ***Id***. at ¶¶ 25-34. Specifically, Appellants asserted C&K "acted negligently in permitting workmen to perform tasks at the work site in a manner which violated the industry safety practices, trade practices and standards of care" that are generally accepted within the construction industry. ***Id***. at ¶ 34.

However, the trial court concluded that the evidence adduced by Appellants was insufficient to establish a *prima facie* case of negligence:

> Appellants present no reasonable theory as to how C&K was negligent in the use or the assembly of their equipment. Appellants allege no particular risk with said equipment and present no [Occupational Safety and Health Administration ("OSHA")] findings that would substantiate allegations of the same. To allow Appellants to proceed against this defendant would provide a jury empaneled with only enough information to guess or speculate as to what standard of care was possibly breached.

Trial Court Opinion, 8/10/20, at 11. Indeed, the trial court suggests that the only way for Appellants to prevail in this matter is to establish a breach of an OSHA regulation or other law that would establish negligence *per se*. Tellingly, the trial court has cited no precedent in support of this position.

The elements of negligence are practically axiomatic and require a Pennsylvania plaintiff to establish: (1) a duty to conform to a certain standard for the protection of others against unreasonable risks; (2) the defendant's failure to conform to that standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage to the plaintiff. *Jones v. Plumer*, 226 A.3d 1037, 1039-40 (Pa.Super. 2020) (citing *Brewington for Brewington v. City of Philadelphia*, 199 A.3d 348, 355 (Pa. 2018)). The dismissal of Appellants' uncomplicated civil claims for damages rests upon the first two of these elements: duty and breach.

It is well-established that "[t]he primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 280 (Pa. 2005). I note that "[t]he concept of duty in the tort setting can be intertwined with contractual notions of privity, as is the case here, where the task is to determine whether the relationship between the parties gives rise to a duty." *Id*. at 281. While the Majority does not dispute C&K owed some manner of legal duty to McCurdy, it seeks to diminish any such obligation by describing C&K's duties on the job site in limited terms. *See* Majority Memorandum at 11 ("C&K's defined 'Work' under the contract was to provide vacuum trucks and flex hoses."). To my mind, this characterization inappropriately minimizes C&K's role and is plainly at odds with the record.

At a contractual level, C&K was hired by Graycor to "provide vacuum and other industrial services as directed," which included: (1) hardware and trucks; (2) set-up of the vacuum system; (3) on-site laborers and vacuum operators; (4) supervision of the vacuum-related activities; and (5) various protective materials. *See* C C&K's Motion for Summary Judgment, 2/25/19, Exhibit 4 at 1-2. The same contract also provides as follows with respect to the safety of workers:

> [Graycor] does not assume responsibility for [C&K's] construction means, methods, and techniques in performing the work. As an expert in its Work, [C&K] agrees, as to its Work, it is (a) solely responsible for the prevention of accidents to its employees and its sub-subcontractors' employees arising out of the performance of its work, and (b) primarily responsible for the prevention of accidents to others who happen to be potentially exposed to hazards arising out of the Work as it is being performed.

*Id*. at 3 (emphasis added). Moreover, the record clearly evinces C&K was also tasked with overseeing worker safety. *See* C&K's Motion for Summary Judgment, 2/25/19, Exhibit 4 at 27-28, 40 (deposition testimony of Joseph James Ott); *see also* Appellants' Supplemental Brief in Opposition to Summary Judgment, 4/12/19, Exhibit D at 3 (unpaginated) (documenting that C&K collaborated with Graycor in developing a "job hazard analysis," training Graycor employees "in the vacuum work," and developing a "safety plan").

Viewed in the light most favorable to Appellants, I find that C&K's contractual duties would include ensuring that the vacuum system was safe to use and free from technical defects. As our Supreme Court has observed:

> Logically, safety responsibility best rests on the subcontractor doing the work, **for that party is most familiar with the work and its particular hazards.** As we stated in *Hader v. Coplay Cement Mfg. Co.*, 189 A.2d 271, 277 (Pa. 1963), "How can the other party control the contractor who is engaged to do the work and presumably knows more about doing it than the man who by contract authorized him to do it? Responsibility goes with authority." Thus, a contractor who undertakes a task is in the best position to provide for the safe accomplishment thereof . . . .

*Leonard v. Commonwealth*, 771 A.2d 1238, 1242 (Pa. 2001) (emphasis added). Since C&K is a sophisticated corporate entity specializing in industrial vacuum systems and was retained by Graycor for that specific expertise, it makes sense for C&K to bear responsibility for the safety of that system.[5]

---

[5] Even in the absence of a contract, I would still find that C&K owed a duty under these circumstances. Pennsylvania law provides that "[a] party to a contract has **two duties**: a contractual duty and a legal duty to act without negligence towards both the other party to the contract and third parties." *Weiser v. Bethlehem Steel Corp.*, 508 A.2d 1241, 1245 (Pa.Super. 1986) (collecting cases; emphasis added). Therefore, "a tort duty can arise absent privity of contract[.]" *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 282 (Pa. 2005). To that end, Pennsylvania law provides that "a subcontractor on a construction job owes to employees of other subcontractors, on the same site, the care due a business visitor from a possessor [of] land." *McKenzie v. Cost Bros., Inc.*, 409 A.2d 362, 364 (Pa. 1979) (citing Restatement (Second) of Torts §§ 343, 384 (1965)).

In this context, the touchstone of duty remains the nature of the work entrusted to the subcontractor, since this rule "applies to subject the particular contractor or subcontractor to liability for only such harm as is done by the particular work entrusted to him." *Duffy v. Fischbach & Moore, Inc.*, 126 A.2d 413, 416 (Pa. 1956). This duty follows the principle that "[e]very workman is entitled to a workshop devoid of perilous conditions that serious reflection, reasonable anticipation, and practicable scientific preparation can avoid." *Id*. Based on the above discussion of C&K's specific duties at C Battery, I would find C&K also had a duty to warn the employees of other
*(Footnote Continued Next Page)*

*See*, *e.g.*, *Heath v. Huth Engineers, Inc.*, 420 A.2d 758, 759 (Pa.Super. 1980) (holding engineering firm that undertook responsibilities for supervision and inspection were liable for failure to do so with "reasonable care").

Turning to the issue of breach, I note that "expert testimony is required to establish professional negligence where the determination of whether the actions were negligent is beyond the understanding of the ordinary person." *Cipriani v. Sun Pipe Line Co.*, 574 A.2d 706, 715 (Pa.Super. 1990). Here, Appellants submitted an affidavit from professional engineer John G. Green, II, who opined, *inter alia*, that the use of ungrounded PVC pipe in the vacuum system deviated from professional standards promulgated by the National Fire Protection Association ("NFPA").[6] *See* Appellant's Brief in Opposition to Summary Judgment, 3/29/19, Exhibit C at ¶¶ 16-25 ("Green's Affidavit").

In pertinent part, Green's affidavit provides as follows:

16. The [NFPA] has been addressing static electricity since the mid 1930s and officially adopted NFPA 77 – Recommended Practice on Static Electricity in 1946.

---

subcontractors on the job site of dangerous or unsafe conditions that it knew, or should have known, about its own industrial vacuum system.

[6] With respect to his credentials, Green averred without objection from C&K that he holds a bachelor's degree in mechanical engineering and is a licensed professional engineer in sixteen states including Pennsylvania. *See* Appellant's Brief in Opposition to Summary Judgment, 3/29/19, Exhibit C at ¶¶ 3-4. In addition to thirty-five years of "relevant experience in industrial machinery, process systems, and construction site safety," he has "supervised projects involving dust removal using large truck mounted vacuum systems similar to those involved with this case." *Id*. at ¶¶ 4-5.

NFPA 77-2007 Section 9.3 Mechanisms of Static Electric Charging states:

> **9.3.1** Contact static electric charging occurs extensively in the movement of powders, both by surface friction between powders and surfaces and by friction between individual powder particles. . . .
>
> **9.3.2** Charging can be expected any time a powder comes into contact with another surface, such as in sieving, pouring, scrolling grinding, micronizing, sliding[,] and pneumatic conveying. . . .

17. The hazards associated with a discharge or spark created by the static electric build-up from pneumatically conveyed materials have been known for more than 70 years. The most notable hazard is an ignition source for combustible dust or vapors, but injuries to workers can also result from static electric discharge[.]

18. McCurdy was exposed to the discharge or spark hazard created by a static electric build-up within the pneumatic conveying transport or piping system. The combination of hazard and exposure created an unreasonably dangerous condition which was a cause of the injury to McCurdy.

19. The incident industrial vacuum truck pneumatically conveyed the mortar dust from the flue of C [B]attery into the holding tank on the truck using non-conductive hoses as the transport system.

. . . .

21. The PVC [f]lex hose was non-conductive material. Non-conductive material should not be used in pneumatic systems to transport powdered materials, such as mortar dust, due to the potential static charge build-up within the transport system. If non-conductive flexible hose is required it should contain a spiral wire specifically designed to dissipate the static electric charge to ground[:]

NFPA 77-2007 Section 9.6 Pneumatic Transport Systems states:

> **9.6.1** Pneumatic transport of powdered material through pipes or ducts can produce a static electric charge on both the product being transported and the

- 10 -

conduit. This static electric charge remains on the material as it exits the system. Precautions against accumulation of charge should be taken where the material is collected.

**9.6.2** Pipes and ducts should be metal and should be grounded.

**9.6.2.1** Equipment to which the conduits connect should be metal and grounded to dissipate the charge impressed on it by the transport of the material.

**9.6.2.2** Where the use of pipe-joining methods or installation of piping components results in an interruption of continuity of the ground path, one of the following criteria should be met:

(1) A jumper cable should be used to maintain continuity.

(2) An independent ground should be provided for the isolated section of the conduit . . . .

**9.6.3** Nonconductive pipe or ductwork should not be used.

*Id* (internal emphases omitted). Relying upon these NFPA standards, Green concluded that C&K was negligent to the extent that it, *inter alia*, permitted the use of ungrounded PVC pipes in its system. *Id*. at ¶¶ 21, 24-25.

The Majority concludes Green's affidavit does not establish breach of a relevant standard of care. *See* Majority Memorandum at 16 ("Because Green's report does not point to any countervailing evidence in the record to support his conclusion that C&K did not act with reasonable care, that report alone is insufficient to create a material issue of fact regarding C&K's duty of

care."). I disagree and note that summary judgment presents an inopportune juncture to assess the credibility of expert testimony:

> It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury. Accordingly, trial judges are required to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof.

***Thompson v. Ginkel***, 95 A.3d 900, 905-06 (Pa.Super. 2014).

As an initial matter, I note that the trial court did not even deign to discuss the substance of Green's affidavit in its opinion. ***See*** Trial Court Opinion, 8/10/20, at 1-12. Therein, the trial court would have read that "nonconductive pipe" should not be used in setting up a vacuum system pursuant to NFPA § 9.6.3. Green's Affidavit at ¶ 22. Rather, the affidavit states that only independently grounded, metal pipework should be used for such a purpose. ***Id***. (citing NFPA §§ 9.6.2, 9.6.2.1). Indeed, Green goes on to explain that if the use of pipework in a vacuum system results in an "interruption of continuity of the ground path," then a "jumper cable" or an "independent ground" must be installed on the pipework. ***Id***. (citing NFPA § 9.6.2.2(1)-(2)). ***Id***. Applying these standards to the case at hand, Green

concluded that the use of PVC pipe in the vacuum system used at C Battery violated the above-quoted NFPA industry standards.[7]  *Id*. at ¶¶ 21, 24-25.

There is no dispute in the record that the PVC extensions mounted to the vacuum system were non-conductive, non-metal, and not independently grounded at the time of McCurdy's injury.  Considering Green's expert opinion with the deference required by our standard of review, I find his affidavit proffers both the applicable standard of care and a breach thereof, consequently creating an issue of material fact that requires denial of summary judgment.  While Graycor may have installed the length of PVC pipe that McCurdy used on the day of his injury, C&K provided that PVC pipe to Graycor and was fully aware of its inclusion in the vacuum system.  Moreover, C&K employees worked side-by-side with Graycor employees while the PVC-tipped vacuum hoses were installed and actively used.

Given the scope of C&K's contractual duties and the breaches of industry standards set forth in Green's affidavit, I find Appellants have raised a material

---

[7]  The Majority's discussion seems to conflate the polyethylene hoses and the PVC extensions.  *See* Majority Memorandum at 14 ("Green stated multiple times that the flexible vacuum hose provided by C&K was 'non-conductive material.'").  The relevant passages in Green's affidavit cited by the Majority refer to the PVC piping discussed above, and not to the polyethylene hoses.  *See* Green's Affidavit at ¶ 21 ("The **PVC Flex hose** was non-conductive material.  Non-conductive material should not be used in pneumatic systems to transport powdered materials, such as mortar dust, due to the potential static charge build-up in the transport system." (emphasis added)).  While polyethylene is also a non-conductive material, this portion of the vacuum system was equipped with a spiral grounding wire.  By contrast, the PVC extension was **not** independently grounded at the time of McCurdy's accident.

question of fact as to whether C&K breached its duty by standing mute and inert with respect to an unsafe condition that, ultimately, injured McCurdy. *See*, *e.g.*, *Maas v. UPMC Presbyterian Shadyside*, 192 A.3d 1139, 1144 (Pa.Super. 2018) ("Where . . . the plaintiff makes a *prima facie* showing of a duty, the applicable standard of care, whether it was breached, and whether the breach was a cause in fact of the injury are questions of fact for the jury.").

Therefore, I respectfully dissent.